ALASKA PUBLIC EMPLOYEES ASSOCIA-
TION and Don H. Strode, on behalf of
himself and all others similarly situated,
Appellants,

v.

STATE of Alaska and Commissioner of Ad-
ministration, Joseph R. Henri,
Appellees.

No. 1999.

Supreme Court of Alaska.

July 29, 1974.

William B. Rozell of Faulkner, Banfield,
Doogan, Gross & Holmes, Juneau, and
Herbert H. Fuller of Fuller & Fuller,
Olympia, Wash., for appellants.

John E. Havelock, Atty. Gen., and James
Douglas, Asst. Atty. Gen., Juneau, for ap-
pellees.

Before RABINOWITZ, C. J., and CON-
NOR, ERWIN, and FITZGERALD, JJ.

### OPINION

RABINOWITZ, Chief Justice.

Don Strode and the Alaska Public Em-
ployees Association (hereinafter APEA)
appeal from a summary judgment entered
against them by the superior court. The
sole issue of contention concerns interpre-
tation of AS 39.27.022, which makes provi-
sion for pay increments longevity in state
service.

AS 39.27.022, the statute in question, be-
came effective on July 1, 1972, and reads
as follows:

> (a) Pay increments, computed at the
> rate of 3.75 per cent of the employee's
> base salary, shall be provided for an em-
> ployee after he has remained in the final
> step within a given range for two years,
> provided that the employee has worked
> continuously for the state for seven
> years and provided that his current an-
> nual rating by his supervisors is desig-
> nated as 'good' or higher.

> (b) Additional increments, each com-
> puted at the rate of 3.75 per cent of the
> employee's base salary, shall be provided
> under the same restrictions as provided
> in (a) of this section when the employee

has remained in the final step for four, nine and thirteen years.

(c) Longevity pay increments provided for in (a) and (b) of this section are approved under AS 39.25.150(2) as an amendment to the pay plan for employees of the state.

Prior to the enactment of this statute, Alaska provided no longevity increases for its employees once they had attained the final step in their salary range.[1] At the time that AS 39.27.022 was being debated by the legislature, it was argued that the six-step pay scale of the state, when contrasted to the ten-step pay scale of the federal government, put the state in a disadvantageous position in retaining qualified and experienced personnel. House Bill 32, the original pay increment bill proposed in the state legislature, provided for an increment of 3.75 per cent of one's salary for each two-year period· spent within a final step in a salary range. The Committee Substitute for House Bill 32, (hereinafter CSHB 32) lengthened the incremental periods to two, four, nine, and thirteen years, and this scheme was subsequently enacted into law as AS 39.27.022.

Following enactment of AS 39.27.022, the Department of Administration was faced with the task of implementing this legislation. Guided by what it thought were manifestations of legislative intent with regard to retroactivity,[2] the Department concluded that the initial increment provided by subsection (a) should be granted immediately to those employees who had served at least seven years in the state's employ, with at least two of those years in the final step of the individual's pay range. The next question facing the Department was whether the additional increments set forth in subsection (b) should likewise be granted immediately to those employees otherwise qualified, or whether the subsection (b) increments, unlike the increment in subsection (a), were contingent upon further state service.

The Department initially concluded in a circulated personnel memorandum that the statute granted all four longevity personnel memorandum that the statute granted all four longevity increments effective July 1, 1972. Two weeks later, following receipt of advice from the Attorney General's office, the Department issued a second memorandum which superseded the first and provided that "[n]ot more than the first increment is authorized." Thereafter APEA and Don Strode brought an action in the superior court to challenge the interpretation placed on AS 39.27.022 by the Department of Administration.[3] They argued that the statute should be read as granting all the longevity pay increments to those qualified by past service on the effective date of the act. Both parties moved for summary judgment in the court below, and the superior court ruled in favor of the State of Alaska. This appeal followed.

The single question presented to this court for review is whether, as of July 1,

---

1. Salaries for state employees are divided into 24 ranges, numbered "5" to "28." Prior to the enactment of AS 39.27.022, there were six "step" increments, lettered from "A" to "F" within each range. Once a state employee had attained step "F," he could not receive any increase in salary without changing jobs to a position in a higher salary range.

2. These manifestations of legislative intent included a statement in the House Journal and the fiscal notes accompanying the legislation. Both items are discussed *infra*.

It should be noted that when prospective versus retroactive application of the statute in the case at bar is mentioned, we are not discussing whether the pay increases should be awarded for any period prior to the enactment of AS 39.27.022. The language, as used herein, simply refers to the issue of whether or not the statute should be interpreted as giving credit for time spent prior to the enactment of the statute in the final step of one's salary range. It should also be noted that both parties agree that the present statute is at least partially retroactive.

3. At the time suit was filed, Don Strode had been employed by the State of Alaska continuously for over seven years, had a current annual rating of "good" or higher, and had remained in the final step within his salary range for five years. Thus, under the interpretation of AS 39.27.022 urged by APEA in this case, Don Strode would be entitled to the first two pay˘ increments, or a total salary increase of 7.5 per cent, as of July 1, 1972.

1972, state employees who otherwise met the statutory eligibility requirements and had been in the last step of their pay range for four, nine, or thirteen years should have immediately received the pay increments provided by AS 39.27.022(b), or whether the subsection (b) increments were prospective only and contingent upon continued state service.

Appellants' initial argument is that the meaning of AS 39.27.022 is clear and unambiguous. They argue that the language of the statute in question mandates that the longevity pay increments provided by subsections (a) and (b) be granted as of the effective date of the act. Since this plain meaning can be distilled from the text of the statute, appellants contend that we should look no further for interpretive aids.[4] APEA and Strode focus specifically on the verb tense utilized in the statute. The statute provides in subsection (a) that an employee is entitled to a salary increase "after he *has remained* in the final step" of a particular range for two years and after he *"has worked* continually for the state" for seven years. Subsection (b) utilizes the same verb tense. Thus, they argue that the use of the present perfect tense of the verb in both subsections clearly indicates a legislative intent to count time spent in a final salary range prior to passage of the act towards eligibility for all the longevity pay increments.

Appellees respond by emphasizing that both subsections (a) and (b) are wholly silent as to when any of the increments should be granted.[5] Appellees argue that at least three interpretations are equally plausible when the text of the statute is examined. First, the statute could be prospectively implemented by computing the time requirements for all the pay increments from July 1, 1972, for those employees already in the final step of their salary range, or from the time of an employee's entry into the final step if it occurred after July 1, 1972. This approach would disregard all the time spent in a final step prior to July 1, 1972.

A second possible interpretation urged is that the first pay increment could be granted to all employees who had been in the state's employ for the required seven years and had spent at least two years in the final step of their pay range, but additional increments would be made contingent on further state service. This interpretation would disregard all but two years of the time spent in the final step of a salary range prior to July 1, 1972. Thirdly, the statute could be interpreted as granting not only the first increment but all four increments in a relation-back manner according to the number of years which each employee had already spent in the final step of a given salary range.

■ We do not think that the language of AS 39.27.022 is clear and unambiguous as to when the pay increments in either subsection (a) or (b) should be granted. The wisdom of attempting to ascertain the meaning of this statute as to its timing from the legislature's use of the present perfect tense of a verb is doubtful at best.[6] Confronted with the statute's silence as to the timing of implementation of the longevity pay benefits of subsections (a) and (b), we find it necessary to resort to the extrinsic interpretive aids of legislative history and the policy and purpose of AS 39.27.022.

Where the meaning of a particular statute, or section thereof, is unclear or ambig-

4. *See* Application of Babcock, 387 P.2d 694, 696 n. 6 (Alaska 1963), wherein this court noted, with approval, the following language of State v. Duggan, 15 R.S. 403, 6 A. 787, 788 (1886) :

   It is an elementary proposition that courts only determine, by construction, the scope and intent of a law when the law itself is ambiguous or doubtful. If the law is plain, and within the legislative power, it declares itself, and nothing is left for interpretation.

5. Appellees have not advanced on appeal the argument that the Attorney General's opinion rendered in July 1972 is evidence of the correct interpretation of the statute.

6. *See* 2A Sutherland Statutory Construction § 45.14 (4th ed. Sands 1973). *But see* Beeler & Campbell Supply Co. v. Warren, 151 Kan. 755, 100 P.2d 700 (1940).

uous, a court should resort to legislative history to determine legislative intent.[7] The litigants in the case at bar have directed our attention to three separate components of the legislative history of AS 39.27.022. We will address each component in turn.

The report of a conference committee in charge of a particular bill may prove helpful in construing an ambiguous statute.[8] Appellants point to the following statement in the Free Conference Committee report:

> House Bill 32—pay increases for state employees—eligibility for longevity pay increments becomes effective immediately upon the effective date of the Act.[9]

Appellants contend that the use of the singular "eligibility" with the plural "increments" indicates that the Free Conference Committee intended that all pay increments be granted immediately on the effective date of the act. This interpretation would mean that if a state employee had been in the final step of his salary range for four years as of July 1, 1972, and was otherwise eligible, then that employee would be entitled to two pay increments, or a 7.5 per cent increase in pay. If the committee had intended that only the initial pay increment of subsection (a) was to become effective, appellants argue that they would have utilized the singular "increment."

Appellees respond to this argument by asserting that the statement of the committee is as ambiguous as the silence of AS 39.27.022 on the issue of implementation of the pay increments. Appellees point out that the word "increments" in this cryptic statement could have been intended as a

reference either to "state employees" or the several increments of the bill, or both.

A technical application of the correct grammatical usage of singular and plural might indeed favor the interpretation urged by appellants APEA and Strode. But, as indicated previously, we are reluctant to impose such strict rules when interpreting statutory language, much less the terse language of this committee report.[10] While this use of singular and plural cannot, in our view, be attributed much weight in determining legislative intent, the report does indicate that at least some portion of the act was intended by the legislature to be applied in a relation-back manner. If the incremental periods of service were to be applied in a totally prospective manner, eligibility for even the initial pay increase would have to wait two years. Given this indication of retroactivity and the similarity in the phrasing of subsections (a) and (b), the most intrinsically reasonable interpretation of the bill would seem to be that, in the absence of any indications of legislative intent to the contrary, if eligibility for the initial pay increase was to become effective on July 1, 1972, then eligibility for all the incremental increases should become effective on that date.[11] There would seem to be no basis in either the language of the statute or the Conference Committee's statement for employing differing implementation approaches for subsections (a) and (b).

Appellants next direct our attention to an affidavit submitted by Representative Mike Miller, a prime sponsor of House Bill 32 and leader of the floor debate in the House on the committee's substitute

7. "Legislative intent" is the commonly used phrase when a court is attempting to interpret a statute by means of an extrinsic aid such as legislative history. When a court resorts to intrinsic aids to statutory interpretation, the phrase utilized is simply "meaning of the statute." 2A Sutherland Statutory Construction § 45.08 (4th ed. Sands 1973).

8. See 2A Sutherland Statutory Construction § 48.08 (4th ed. Sands 1973); cf. Miller v. Monrean, 507 P.2d 771, 776 n. 13 (Alaska 1973), where we said, "Reports of legislative committees may be regarded as an exposition of the legislative intent where otherwise

the meaning of the statute is obscure." Starr v. Hagglund, 374 P.2d 316, 319 (Alaska 1962); Knudsen v. City of Anchorage, 358 P.2d 375, 377–378 (Alaska 1960).

9. Free Conference Committee Report, Senate and House Journal Supplement No. 12, p. 4 (June 18, 1972).

10. See 2A Sutherland Statutory Construction § 47.34 (4th ed. Sands 1973). See also note 6, supra.

11. Cf. State v. City of Anchorage, 513 P.2d 1104, 1110–1111 (Alaska 1973).

version of the bill, CSHB 32. Representative Miller stated in part:

> [As] originally introduced, House Bill 32 provided for a 3.75% salary increment every two years and it was intended that an employee would receive all salary increments to which he was entitled beginning on the effective date of the act; . . . when Committee Substitute for House Bill 32 was reported out on the floor of the House, I, as the prime sponsor, was charged with the responsibility of leading the floor debate on that bill; . . . during the committee discussions, we had, I believe, generally understood that all of the salary increments to which an employee was entitled on the effective date of the act would be provided that employee at that time, and my recollection is that during the floor debate, I was specifically asked a question on that point and reponded to the members of the House that that was indeed the intent of the bill;
> · · ·

The quoted portion of Representative Miller's affidavit makes two basic assertions: first, it gives his basic understanding, and his view of the committee's understanding, of the meaning of the disputed portion of the bill, and secondly, it gives his recollection of a statement he made during the House debate concerning the intent of the bill. With regard to the first claim, we are of the view that subsequent testimony of even the prime sponsor of a bill as to either his own understanding or the legislature's understanding of the meaning of that bill should not be considered by a court in construing legislative intent. We do not wish to transform statutory construction into a parade of legisla-

tors' affidavits containing their perceptions of the meaning of a bill.[12]

Representative Miller's statement as to his response made during House debate on the bill is, however, relevant to our task of statutory interpretation. In Schwegmann v. Calvert Distillers Corp., 341 U.S. 384, 394–395, 71 S.Ct. 745, 95 L.Ed. 1035, 1048 (1951), Justice Douglas wrote that "[i]t is the sponsors that we look to when the meaning of statutory words is in doubt." The case concerned the interpretation of the Miller-Tydings Act, and Justice Douglas relied upon the statements of sponsors of the act made during the floor debate to support his conclusions as to legislative intent.

We think that the statements made by a bill's sponsor in the course of legislative deliberations should be considered as relevant evidence when a court is trying to determine legislative intent.

> In the course of deliberations on a bill, legislators look to its sponsor as well as to the representative of the committee having charge of it, as one who is expected to be particularly well informed about its purpose, meaning, and intended effect. In recognition of this reality of legislative practice, courts give consideration to statements made by a bill's sponsor on grounds similar to those relied on to support the use of statements by the committeeman in charge of the bill. (footnote omitted)[13]

Of course, even the statements of a bill's sponsor made during floor debate must be evaluated cautiously. Other members of the legislature may be as equally informed as a sponsor about a bill. While at the same time the statements of a sponsor may be motivated by efforts to improve the chances for the bill's enactment.[14]

12. *See* 2A Sutherland Statutory Construction § 48.16 (4th ed. Sands 1973) ; Financial Indem. Co. v. Cargile, 32 Ohio Misc. 103, 288 N.E.2d 861, 863, 61 Ohio Op.2d 176 (Ohio Com.Pl.1972). State v. Norene, 457 P.2d 926, 936 (Alaska 1969). *Compare* Starr v. Hagglund, 374 P.2d 316, 319 (Alaska 1962).

13. 2A Sutherland Statutory Construction § 48.15 (4th ed. Sands 1973).

14. *Id.* The evidentiary value attached to a sponsor's statements during floor debate on a bill derives from the weight which other legislators will attach to these statements. The theory is that other legislators will generally regard the sponsor's statements as knowledgeable with regard to the nature and effect of the bill, so that these statements will reflect to some degree the subsequent legislative intent.

There is in the case at bar an additional reason for exercising caution before ascribing much evidentiary weight to the affidavit of Representative Miller. We have in this case no first-hand record of what statements were made by Representative Miller during the floor debate on this bill, but only his "recollection" of a statement made during this discussion. Accordingly, we think that Representative Miller's recollection of the statement made by him during floor debate, while relevant to the issue of legislative intent, must be evaluated cautiously because of its "recollective" nature. Nevertheless, when viewed in this manner Representative Miller's statement lends some support to the retroactive interpretation of AS 39.27.022 urged by APEA and Strode.[15]

Appellees direct our attention to the fiscal analysis which accompanied the bill in the House Finance Committee. It is on this aspect of legislative history that appellees, the state, and Commissioner Henri place almost total reliance for their interpretation of AS 39.27.022.

The Division of Budget and Management in the Department of Administration prepared a fiscal analysis of House Bill 32 at the request of the House Finance Committee in 1971. The analysis seems to have been prepared on the assumption that the bill provided only one initial increment for all state employees who had spent two years or more in the final step of their salary range. The fiscal analysis was updated in 1972 for CSHB 32, and it appears that the same assumptions were operating in the Budget Division's analysis. This fiscal analysis was included in the minutes of the Finance Committee. The fiscal analysis indicated that $423,200 would be needed to fund the bill during the first year, and this funding recommendation was later followed exactly by the legislature in its annual appropriation bill (Ch. 204, SLA 1972).

Appellees argue that the amount of money appropriated to fund CSHB 32 for the first year indicates that the legislature adopted the funding analysis *in toto,* including the assumptions on which it was based. Those assumptions, appellees contend, became solidified as the legislature's intent, and part of the bill itself.

We find appellees' argument unpersuasive. The fiscal analysis reports on HB 32 and CSHB 32 that were included as part of the minutes of the House Finance Committee are not, in our view, indicative in themselves of legislative intent. Courts have been reluctant to attempt to ascertain legislative intent from statements made before a committee when no committee report incorporating those statements has been prepared and distributed in the legislature.[16] In the case at bar, the state has made no showing that these reports

---

15. We note that appellees, in their brief submitted to this court, do not mention Representative Miller's affidavit of its evidentiary value in connection with the task of statutory interpretation.

In regard to the scope of review of findings of fact, generally, we refer to the discussion in Alaska Foods, Inc. v. American Mfr.'s Mut. Ins. Co., 482 P.2d 842, 843–848 (Alaska 1971). Justice Dimond writing for the court explained in considerable detail the scope of this court's review of findings of fact made pursuant to Civil Rule 52(a). In adopting the clearly erroneous standard the opinion states:

This rule applies to any finding, regardless of the nature of the evidence upon which it is based. The only difference between our review of findings based on oral testimony, and those based on documentary evidence or undisputed facts, is that in the former case we must pay some deference to the trial judge's assessment of the credibility of witnesses, whereas in the latter case we need not. It is because of the deference we pay to the trial judge's assessment of credibility of witnesses where there is oral testimony that we have characterized our scope of review in cases where there is no oral testimony as being a "broader" type of review. Even in the latter situation, clear error must appear under the rule we apply.

16. *See* 2A Sutherland Statutory Construction § 48.10 (4th ed. Sands 1973). *See also* Mutual Benefit Life Ins. Co. v. Duffy, 295 F. 881, 894 (D.C.N.J.1924).

were ever read by the Finance Committee members or submitted in any form to the members of the legislature in general. Thus, we do not regard the mere presence of these fiscal reports in the Finance Committee's minutes as evidence of any legislative intent with regard to CSHB 32.

Appellees' argument that the amount of money appropriated for CSHB 32 at the conclusion of the legislative session indicates a legislative intent to implement only the pay increase in subsection (a) is similarly unpersuasive. Appellees cite no authority for this novel proposition. Appropriation bills cover an enormous array of disparate topics, and unless the legislature history demonstrates an intent to focus on a particular item, there is no reason to suppose that the sum of money actually appropriated reflects a specific legislative intent toward the program.[17]

Interpretation of legislation should take into consideration the general purpose and policy of the act.[18] The litigants in the present case agree that the purposes of AS 39.27.022 are twofold, namely: to provide a reward for longevity in state employ, and to re-establish an incentive for employees who have attained the final step within a given range to continue in their employment.

Appellees advance the contention that the interpretation of the statute urged by APEA and Strode fails to satisfy the incentive purpose of the act because a certain number of employees would immediately fall into a new final step and still be dead-ended. Thus, the incentive provided by longevity steps would be lacking for these employees. We find that appellees' position is not compelling. A state employee is certainly more likely to continue in state employ if he is presently earning an increased salary than if he is earning a lesser salary with only the future prospect of receiving such an increased salary after many additional years of service. Incentive to remain in state employ for these employees would derive from their increased present salaries. We think that the interpretation of AS 39.27.022 urged by appellants APEA and Strode is in consonance with both the policy and purpose of the statute.[19]

■ We therefore conclude that the interpretation of AS 39.27.022 urged by appellants is the more reasonable one. The language of the statute is not clear and unambiguous as to when the pay increments should be implemented. However, the Free Conference Committee Report indicates an intention that at least some increment be implemented immediately. Since the wording of subsections (a) and (b) is nearly identical, there would seem to be no basis for assigning different implementation times to the increments, unless an indication of such legislative intent is to be found elsewhere. We have discovered no such expression of contrary legislative intent. Accordingly, the judgment entered by the superior court is reversed.

Reversed.

BOOCHEVER, J., not participating.

17. In an analysis performed by the state after enactment of CSHB 32, the cost of implementation of the bill as interpreted by appellees in this case was projected to be $382,281, while the projected cost under appellants' interpretation was $563,735. The amount appropriated by the legislature was $423,200, a sum that falls between these two figures of projected cost.

18. See, e. g., United States v. State of Ohio, 354 F.2d 549 (6th Cir. 1966) ; City of Costa Mesa v. McKenzie, 30 Cal.App.3d 763, 106 Cal.Rptr. 659 (Cal.App.1973).

19. Appellees also argue that the basic salary plan for employees is a simple one of one step at a time and that appellants' interpretation of AS 39.27.022 violates this principle by allowing certain employees to skip steps. Appellees characterize such skipping as a "windfall" to the employees. This argument is ill-founded. Employees entitled to skip steps under appellants' interpretation of the statute would be those who had provided years of additional service to the state in what was formerly the final step of their pay range. We think it a mischaracterization to portray the skipping of steps by these employees as a "windfall."