**John R. RODERICK, Mayor of the Greater Anchorage Area Borough, et al., Appellants,**

**v.**

**George M. SULLIVAN, Mayor of the City of Anchorage, Alaska, et al., Appellees.**

**No. 2243.**

Supreme Court of Alaska.

Nov. 22, 1974.

Richard A. Weinig, Asst. Borough Atty., Gary Thurlow, Borough Atty., Anchorage, for appellants.

James T. Robinson, Asst. City Atty., John Spencer, City Atty., Anchorage, for appellees.

Before RABINOWITZ, Chief Justice, and CONNOR, ERWIN and BOOCHEVER, Justices.

## OPINION

BOOCHEVER, Justice.

This latest in a series of internecine conflicts between the Greater Anchorage Area Borough and the City of Anchorage centers on whether the voters of the borough must ratify an ordinance altering the manner of selecting borough assemblymen and specifying eleven districts from which they are to be elected. The present borough assembly is composed of eleven members: five city councilmen, appointed by the City Council of Anchorage, and six members

from the area outside the city, elected from single-member districts.[1]

On July 16, 1973, the borough assembly enacted Ordinance No, OR 73–140 which changed the assembly composition. Under the new ordinance, the assembly was still to be composed of eleven members, but each member was to be elected from an in-dividual district. In short, the Anchorage City Council was stripped of its power to appoint five members of the eleven-member assembly. The assembly sought to gain voter approval of the new ordinance through an election scheduled for August of 1973. However, the city sued to enjoin the election on the basis that AS 29.23.020 [2]

---

1. The present composition was formerly di-rected by AS 07.10.040 which provided in part:

(4) The assembly seats shall be appor-tioned as follows:

(a) Except as provided in (2) of this section, each first class city shall have the number of seats designated in the follow-ing table, unless a lesser number is ap-proved by a resolution of the city council of the city concerned:

| Population | Assembly Seats |
| --- | --- |
| under 2,000 | 1 |
| 2,000–6,000 | 2 |
| 6,001–12,000 | 3 |
| 12,001–30,000 | 4 |
| over 30,000 | 5 |

(b) The area outside first class cities shall have a number of assemblymen which shall equal one more than the total number of all assemblymen who represent first class cities.

Title 7 (Boroughs) of Alaska Statutes, in-cluding AS 07.10.040, was repealed in 1972, as was former Title 29 (Municipal Corpora-tions). A new Title 29 (Municipal Corpora-tions) was enacted in lieu of the repealed provisions.

2. AS 29.23.020 provides:

(a) The assembly shall be composed of the number of members and be apportioned in a manner set out in the incorporation petition approved by the voters or, if a borough is already incorporated, the as-sembly shall be composed and apportioned in a manner prescribed by charter or ordi-nance. Assembly composition and appor-tionment, including voting procedures based on the apportionment, may be prescribed in any manner consistent with the equal representation standards of the Constitution of the United States.

(b) Within six months of October 14, 1972, and thereafter within six months of the official report of a federal decennial census and issuance of any supplementary data to the report necessary to establish population distribution within the borough, the assembly shall

(1) determine and declare by resolution whether the existing assembly apportion-ment meets the standards designated under (a) of this section;

(2) if the existing apportionment does not meet the designated standards, provide by ordinance for reapportionment and, if it chooses, changes in assembly composi-tion, in accordance with the designated standards;

(3) submit the ordinance to borough voters for approval or rejection as provided in (c) of this section.

(c) The vote on an ordinance submitted under (b)(3) of this section shall be tabulated in two separate classifications. One classification shall consist of all votes cast in the first class and the home rule cities of the borough. The other classifica-tion shall consist of all votes cast in the remaining areas of the borough. In order for the ordinance to be approved it must re-ceive majority approval in each classifica-tion. If, at the end of the time period prescribed in (b) of this section, no ordi-nance has been approved, the Department of Community and Regional Affairs shall provide for the reapportionment in ac-cordance with the standards designated in (a) of this section.

(d) In addition to providing for appor-tionment at the times required under (b) of this section, the borough assembly shall provide for its reapportionment and, if it chooses, a change in assembly composition, whenever, on the basis of federal census reports or other reliable population data, it determines that the existing apportion-ment does not meet the standards for ap-portionment designated in (a) of this sec-tion. The assembly is required to deter-mine whether the standards are being met upon petition of 50 borough voters. The petition must include reliable evidence that the existing apportionment of the assembly does not meet the designated standards. Reapportionment under this section shall be implemented by ordinance or by act of the Department of Community and Regional Affairs in the same manner as prescribed for reapportionment in (c) of this section.

(e) Members of the assembly are selected according to assembly composition and ap-portionment set out in the incorporation

required specific boundaries of districts to be put before the voters in order properly to accomplish reapportionment of the borough assembly. The city and borough subsequently stipulated to an abandonment of the election, and the superior court agreed to retain continuing jurisdiction over all other matters relative to the case. The borough then, by counterclaim, sought a declaratory judgment from the court to the effect that when the borough assembly has not declared its existing apportionment unconstitutional,[3] an ordinance reapportioning the borough assembly need not be submitted to the voters for ratification as a condition precedent to the validity of the reapportionment plan. In answering, the city urged that the assembly could not sidestep an election but must comply with the election requirements of AS 29.23.020.[4]

The borough assembly enacted Ordinance No. OR 73–238 on November 26, 1973, establishing an apportionment map to govern implementation of the eleven single-member districts and a schedule of elections to take place under the new plan. The first election under the plan was scheduled to be part of the 1974 general election.

On May 21, 1974, Judge Singleton granted summary judgment in favor of the city, ruling that in the instant case the borough must submit the reapportionment plan to the voters as a condition precedent to the plan's validity. The decision rested on two grounds. First, the judge determined that the resolution of August 13, 1973 [5] indicated a determination by the borough assembly that its present apportionment scheme either was unconstitutional [6] or was highly likely to be found unconstitutional, and that under those circumstances, an election was required under AS 29.23.020. Secondly, Judge Singleton reasoned that even if the present plan had not been determined by the assembly to be unconstitutional, AS 29.23.020 is ambiguous as to whether there must be voter ratification of a subsequent apportionment plan. Since the statute is ambiguous on this point, extrinsic aids to interpretation were properly considered and justified a conclusion that voter ratification of the proposed scheme must be sought.

The borough has appealed from the granting of the partial summary judgment. The appeal, involving a narrow question of statutory construction, has been briefed

---

petition approved by the voters or subsequently provided in accordance with this section. A change in assembly composition or apportionment under this section shall be effective beginning with the next regular election to the assembly.

(f) Assembly or Department of Community and Regional Affairs determinations or reapportionments made under this section are subject to judicial review. The running of time periods specified in (b) of this section shall be tolled until a final judgment is rendered in an action brought under this subsection.

(g) This section applies to home rule and general law boroughs.

3. On August 13, 1973, the borough assembly passed Resolution No. RE–113A which stated in part:

The Greater Anchorage Area Borough Assembly hereby resolves:

1. It does *not*, at this time, find that present Greater Anchorage Area Borough Assembly apportionment violates the equal representation requirements of the Constitution of the United States.

2. While it realizes that the Court's holding in City of Fairbanks v. Fairbanks North Star Borough is not directly binding upon this Assembly since the Greater Anchorage Area Borough was not a party to the action, the Assembly feels that if the issue were presented to courts in Anchorage, they could find that present, institutionalized, representation upon the GAAB Assembly by the Anchorage City Council is unconstitutional.

4. *See* note 2 *supra.*

5. *See* note 3 *supra.*

6. The constitutional provision referred to throughout is U.S.Const. Amend. XIV, § 1 which states in part: "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws." Alaska Constitution, art. I, § 1 likewise provides: This constitution is dedicated to the principles that all persons . . . are equal and entitled to equal rights, opportunities, and protection under the law . . . . .

and argued ably, indeed, exhaustively. Since a decision was said to be imperative prior to September 3, 1974, in order that the matter might be placed on the October 1, 1974 ballot, arguments were expedited. On August 29, 1974, this court rendered an order affirming Judge Singleton's decision requiring an election.

We are persuaded that AS 29.23.020 is ambiguous as to whether there must be voter ratification of an apportionment plan when the existing plan has not been determined to be unconstitutional. Further extrinsic aids to interpretation of the statute, referred to for the purpose of resolving the ambiguity, lead to the conclusion that voter ratification is required. We thus find no need to discuss the other basis for the trial court's decision although the judge's oral opinion presents cogent reasons in its support.

Our analysis commences with a review of the provisions of AS 29.23.020. Subsection (a) requires the assembly be composed of the number of members and be apportioned in the manner set out in the incorporation petition approved by the voters, or, if the borough is already incorporated, the assembly "shall be . . . apportioned in a manner prescribed by charter or ordinance." The section further provides that assembly composition and apportionment may be prescribed in any manner consistent with the equal representation standards of the Constitution of the United States.

Subsection (b) requires the assembly to determine after each decennial census whether its apportionment meets the standards of subsection (a), and, if it does not, to provide by ordinance for reapportionment and possible changes in assembly composition. The ordinance must be submitted to the voters for ratification.

Subsection (c) provides for the method of tabulating the votes and an alternative method of reapportionment by the Department of Community and Regional Affairs.

The remaining subsection here relevant is (d) which dictates that the assembly provides for its reapportionment, and

. . . if it chooses . . . change . . . [its] composition, whenever, on the basis of federal census reports or other reliable population data, it determines that the existing apportionment does not meet the standards for apportionment designated in (a) of this section.

Thus the assembly is required to take action when it determines that the apportionment of its assembly fails to meet the standards of the equal protection clause of the United States Constitution. Under those circumstances, authorization is granted to the assembly to make changes in its composition as well as to make the necessary reapportionment. The statute is silent, however, as to whether the assembly may alter either its apportionment or composition when the existing arrangement has not been found by that assembly to be unconstitutional. Section (a) of AS 29.-23.020 specifies in part: ". . . [I]f a borough is already incorporated, the assembly shall be composed and apportioned in a manner prescribed by charter or ordinance." This section may have several referents: (a) that the make up of the assembly may initially be composed and apportioned in a manner prescribed by the charter or ordinance, (b) that there may be changes made in the composition and apportionment by charter or ordinance at any time or (c) such changes may only be made in the manner spelled out in Subsections (b) and (d) of the act which mandate such changes when the assembly apportionment fails to meet equal representation standards. Thus the words, while not ambiguous in themselves, refer to several different possible applications. The parties agree that the statute is ambiguous in this respect, and we affirm the trial court's finding to that effect.[7]

7. When a court declares a statute ambiguous, it asserts that some of the words used may refer to several objects and the manner of their use does not disclose the particular

The parties further agree that this particular ambiguity is best resolved in favor of the assembly having the power to reapportion itself or alter its composition even when there has been no determination of unconstitutionality. Both parties point to the report on the municipal code by the legislative free conference committee as leading to this conclusion. The report which was adopted by all the free conference committee members on May 22, 1972 stated:

> While the section sets out specific times at which the assembly is required to examine its apportionment, the section is intended as well to permit an assembly at its option to propose a change in assembly composition or apportionment, notwithstanding that existing apportionment may satisfy equal protection standards.

Again, we affirm the trial court's finding that the ambiguity be resolved in favor of the assembly having such power.[8]

The disagreement between the parties focuses on whether an election is required for a reapportionment when the assembly has not made a determination of existing unconstitutionality. The borough reads the statute as unambiguous in not requiring such an election, while the city contends that the statute is ambiguous and should be construed to make voter ratification a prerequisite to the implementation of the proposed reorganization.

Although the statute is admittedly ambiguous as to the authorization for the assembly to reapportion under the circumstances here at issue, it does not necessarily follow that the election requirement is likewise ambiguous. For example, if subsection (a) of the statute specified unequivocally that no election be required for reapportionment under its provisions, we would find no ambiguity. But here the statute is silent as to whether an election is required. Taking this in conjunction with its silence on the power of the assembly to reapportion in the absence of a determination of unconstitutionality, we find ambiguity exists as to whether an election is required.

It is well established that the report of a standing committee of the legislature is a

> . . . much used source for determining the intent of the legislature, when it sets forth the committee's . . . understanding of the nature and effect of the measure. . . . Although not decisive, the intent of the legislature as revealed by the committee report is highly persuasive.[9]

Sutherland in his text, Statutory Construction, similarly refers to the utilization of the report of a conference committee, stating:

> . . ., [T]he report of the conference committee appointed to adjust the differences between the two houses as to the proper content of the proposed bill after both have passed conflicting versions of the measure comes within the rationale justifying the use of standing committee reports to determine the legislative intent, when it states the committee's

---

objects to which the words refer. A word is a symbol which directs the reader to a referent, but in this case the reference is not sufficiently accurate to make the referent determinate for the litigation before the court. It is then the function of the court to make the referent determinate or as determinate as possible from the information and evidence which is presented to it. [Citations omitted]

2A J. Sutherland, Statutory Construction, § 45.02 at 5 (4th ed. Sands 1973).

8. We are not here confronted with a question of whether home rule powers apply under the provisions of art. X, § 11 of the Alaska Constitution specifying, "A home rule borough or city may exercise all legislative powers not prohibited by law or by charter." By AS 29.-13.100 the legislature has specifically provided that AS 29.23.020 supersedes existing and prohibits future home rule enactments which provide otherwise. *See* Jefferson v. State, 527 P.2d 37 (Alaska 1974), for a discussion of home rule powers under Alaska's Constitution.

9. 2A J. Sutherland, Statutory Construction § 48.06 (4th ed. Sands 1973) [footnotes omitted]. Alaska Public Employees Assoc. v. State, 525 P.2d 12 (Alaska 1974).

grounds for the compromise it proposes or its understanding as to its nature and effect.[10]

And we have recently specifically approved of the use of conference committee reports as a means of ascertaining legislative intent in Alaska Public Employees Assoc. v. State.[11]

The free conference committee which worked on the state municipal code and drafted the free conference committee substitute for the bill, part of which became AS 29.23.020, issued a committee report dated May 22, 1972 discussing in part the provisions of that section. The report commences by stating as its purpose "to reflect legislative intent where the intent expressed and the pertinent code provisions are consistent".

Paragraph (2) of the portion of the report concerning the section which eventually became AS 29.23.020 states:

> (2) the proposed borough apportionment ordinances must be submitted for

separate voter approval by two majorities: (a) a majority of votes cast in all first class and home rule cities, and (b) a majority of votes cast in the borough area outside those cities.

It is to be noted that no exception to the election requirement is made for ordinances passed without a determination of unconstitutional apportionment or composition. Moreover, in the very section in which the report sets forth the intent of the statute to permit reapportionment even in the absence of a determination of an unconstitutionally apportioned assembly, it refers to the option of the assembly to *"propose"* a change in assembly composition or apportionment.[12]

The use of the term "propose", rather than "establish" or "enact", when coupled with the clear statement of intent set forth in paragraph (2) quoted above, convinces us that the legislature intended that all reapportionment ordinances be submitted to the electorate.[13] We therefore hold that

10. *Id.* § 48.08. Gemsco, Inc. v. Walling, 324 U.S. 244, 65 S.Ct. 605, 89 L.Ed. 921 (1945) ; U. S. v. Pfitsch, 256 U.S. 547, 41 S.Ct. 569, 65 L.Ed. 1084 (1921) ; Pridemark, Inc. v. Commissioner of Internal Revenue, 345 F.2d 35 (4th Cir. 1965) ; Securities and Exchange Commission v. Sunbeam Gold Mines Co., 95 F.2d 699 (9th Cir. 1938). *See* Miller v. Monrean, 507 P.2d 771 (Alaska 1973) ; Starr v. Hagglund, 374 P.2d 316 (Alaska 1962) ; Duplex Printing Press Co. v. Deering, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349 (1921) ; Conference Committee Materials in Interpreting Statutes, 4 Stan.L.Rev. 257 (1952.)

11. 525 P.2d 12 (Alaska 1974). *See* discussion of the use of legislative history in construing an ambiguous statute, at 14–16.

12. The portion of the report is quoted at page 12, *supra.*

13. The borough contends that, even if there is ambiguity as to the election requirement, it should be resolved as favoring a legislative intent not to have ratification of the ordinance by the electorate. It refers to minutes of meetings of the free conference committee indicating that on three occasions proposed amendments were presented by staff members of the Legislative Affairs Agency expressly providing for an election upon passage of an ordinance under subsection (a) of AS 29.23.-

060. We recognize that under some circumstances, the rejection by the legislature of a specific provision of a proposed law may be persuasive as to the construction of the act. Norweigian Nitrogen Prod. Co. v. United States, 288 U.S. 294, 53 S.Ct. 84, 77 L.Ed. 796, 802–803 (1933) ; Madden v. Brotherhood and Union of Transit Employees, 147 F.2d 439, 443–445 (4th Cir. 1945) ; People v. Puritan Ice Cream Co., 24 Cal.2d 645, 151 P.2d 1, 5 (1944) ; City of Manhattan v. Eriksen, 204 Kan. 150, 460 P.82d 622, 625 (1970). Omission of a clause, however, may be due to efforts to effect a compromise by disregarding the section, or to the belief that the proposed provision would be mere surplusage. City of Manhattan v. Eriksen, *supra*; Gilbertson v. McLean, 216 Or. 629, 341 P.2d 139, 145 (1959) ; Giragi v. Moore, 48 Ariz. 33, 58 P.2d 1249, 1252 (1936) ; State v. Lancashire Fire Insurance Co., 66 Ark. 466, 51 S.W. 633 (1899) ; Conference Committee Materials in Interpreting Statutes, 4 Stan.L. Rev. 257, 260 (1952). Here, in view of the provision of subparagraph (d) requiring an election when the asesmbly provides for reapportionment because of failure to meet the standards designated in subparagraph (a), the committee could have considered it surplusage to again specifically require an election when an ordinance is passed under subparagraph (a). Moreover, the committee in rejecting the

the superior court did not err in granting the city's motion for partial summary judgment.

Affirmed.

FITZGERALD, J., not participating.

proposed amendment might not have had in mind the implied power of the assembly to modify apportionment under circumstances not involving a determination of unconstitutionalty under the standards of subparagraph (a). In any event, we find that the clear expression of intent to require elections, set forth in the Free Conference Committee Report of May 22, 1972, to be the more compelling guide to construction of the statute on this issue.