**ALASKA HOUSING FINANCE
CORPORATION,**
Appellant,

v.

**Pat SALVUCCI, Appellee.**

No. S–7220.

Supreme Court of Alaska.

Dec. 19, 1997.

Thomas P. Owens, Jr., and Scott J. Nordstrand, Owens & Turner, P.C., Anchorage, for Appellant.

Jeffrey A. Friedman and Richard H. Friedman, Friedman, Rubin & White, Anchorage, for Appellee.

Before COMPTON, C.J., and RABINOWITZ, MATTHEWS, EASTAUGH and FABE, JJ.

*OPINION*

MATTHEWS, Justice.

## I. *INTRODUCTION*

This is an appeal by the Alaska Housing Finance Corporation (AHFC) from certain rulings of the superior court in favor of former AHFC employee Pat Salvucci. The superior court directed a verdict for Salvucci on his breach of contract claim, ruled that AHFC's termination of Salvucci gave rise to a claim under the Alaska Whistleblower Act,

and held that AHFC was not immune from punitive damages under the Act. The jury found AHFC in violation of the Whistleblower Act and awarded Salvucci compensatory and punitive damages. Salvucci also was granted prejudgment interest on lost past and future wages and benefits as well as on punitive damages. We remand the award of prejudgment interest on lost past and future wages and benefits, reverse the award of punitive damages, and affirm in all other respects.

## II. *FACTS AND PROCEEDINGS*

In 1989 Salvucci was hired by AHFC as its Internal Auditor. At the time of his hire, Salvucci signed a letter stating that his "employment [at AHFC] is at all times subject to AHFC Personnel Rules and any future amendments to those rules." The Personnel Rules divided employees into two groups, the "Regular" and "Executive" Service. Personnel Rule, Section 2.01.0. While the former could be terminated only for cause and only following a disciplinary procedure, the latter could be terminated at will by the Executive Director. All Regular Service employees received contractual employment protection, set forth in Rules 4, 11 and 13;[1] only Executive Service employees did not receive the protection afforded by these rules.

The Executive Service became a part of AHFC Personnel Rules in August 1989 when AHFC's Board of Directors adopted Personnel Rule 2, Section 2.03.03. One of the positions designated Executive Service by Section 2.03.03 was the Internal Auditor

position.[2] Regular Service was defined as "positions within the Corporation that are not in the executive service."

The AHFC's Audit Charter, authored by Salvucci and adopted in June 1990, defined the duties and role of the Internal Auditor. The Charter set forth the reporting procedure, specifically that the Internal Auditor reported administratively to the chief executive officer and functionally to the Audit Committee of the Board of Directors. Further, it mandated that the Internal Auditor's removal required the concurrence of the Audit Committee.

In 1992 AHFC Personnel Rule 2.03.03 was amended. The amended rule shortened the list of Executive Service positions and omitted the Internal Auditor position from the list of positions in the Executive Service.[3] The definition of Regular Service was not changed.

In July 1993 Will Gay became AHFC's Executive Director. In November Gay placed Salvucci on administrative leave, subject to an approval vote by the Audit Committee. In December the Audit Committee concurred in Gay's decision and Salvucci's employment was terminated. Salvucci was not given any reason for his termination and was not afforded a prior disciplinary process, as required for the termination of Regular Service employees.[4]

Salvucci filed a grievance, pursuant to Personnel Rule 13. AHFC refused to consider his grievance and also declined to consider

1. These rules set forth procedures for employee probationary periods, separation and demotion, and grievances and hearings.

2. Section 2.03.03 listed the following as Executive Service positions:

 Chief Operating Officer, Finance Director, Servicing Operations Director, Investor Marketing Director, Chief Administrative Officer, Information Systems Director, Information Systems Director, Mortgage Operations Officer, Corporate Communications Officer, Senior Planner, Controller, Internal Auditor, Consumer Relations Officer, Personnel Officer, Claims/Servicing Officer, Property Disposition Officer, and Executive Secretary.

3. Amended Section 2.03.01 listed the following as Executive Service positions:

 Deputy Executive Director, Division Directors, Deputy Division Directors, all Corporation Directors, Controller, Executive Secretary, Corporate Communications Officer, and Staff Attorney.

4. Salvucci wrote audits and investigative reports regarding internal problems; specifically, alleged racial slurs, fire safety violations, misuse of corporate vehicles and alleged political hires. Salvucci was fired prior to the final version of the personnel audit which included his report concerning the political hires. After his termination, the personnel audit was altered to delete any references to the political hires or the improper hiring practices. Salvucci presented this evidence as proof that he was terminated for "whistleblowing."

his appeal of the grievance refusal, both instances on the ground that the Personnel Rules were inapplicable to the position of Internal Auditor.

After the denial of his internal remedies, Salvucci filed a complaint in superior court alleging breach of contract, breach of the implied covenant of good faith and fair dealing, due process violations, and violation of the Whistleblower Act.

The superior court denied AHFC's motions for summary judgment on Salvucci's claim for punitive damages and on his Whistleblower claim. The court granted a directed verdict for Salvucci on his breach of contract claim,[5] finding that the 1992 amendment removed the Internal Auditor position from the Executive Service, placing the Internal Auditor within the Regular Service, with its accompanying contractual protections.

The jury found that AHFC violated the Whistleblower Act. It awarded Salvucci $43,200 in lost past wages and benefits, $144,234 in lost future wages and benefits, and $500,000 in punitive damages. The superior court awarded Salvucci prejudgment interest on his wage and benefit award and on his punitive damage award, for a total of $62,493.30 in prejudgment interest. The court did not specify what amount of prejudgment interest was awarded for wages and benefits, and what amount of prejudgment interest was awarded for punitive damages.

### III. STANDARD OF REVIEW

■ Interpretation of a contract is a question of law on which this court substitutes its own judgment. *Aviation Associates, Ltd. v. TEMSCO Helicopters, Inc.,* 881 P.2d 1127, 1130 n. 4 (Alaska 1994); *Alaska Energy Auth. v. Fairmont Ins. Co.,* 845 P.2d 420, 421 (Alaska 1993). The court reviews the superior court's decision to grant a directed verdict in the light most favorable to the non-moving party, and affirms only if a reasonable fact finder could not reach a dif-

ferent conclusion. *Barber v. National Bank of Alaska,* 815 P.2d 857, 860 (Alaska 1991).

■ The remaining issues in this case are matters of statutory interpretation. This court applies its independent judgment to questions of statutory interpretation. *Sauve v. Winfree,* 907 P.2d 7, 9 (Alaska 1995).

### IV. DISCUSSION

#### A. The Breach of Contract Claim

■ Contract interpretation generally is the purview of the trial court; the jury interprets the contract only in those cases where the court determines that the contract language is ambiguous as to the parties' intent. *Keffer v. Keffer,* 852 P.2d 394, 397 (Alaska 1993); *Day v. A & G Constr. Co.,* 528 P.2d 440, 443 (Alaska 1974). In determining whether the contract language is ambiguous, the court takes into account circumstances existing at the time the contract was made. *Stepanov v. Homer Elec. Ass'n,* 814 P.2d 731, 734 (Alaska 1991).

■ AHFC contends that the superior court improperly granted a directed verdict for Salvucci on the breach of contract claim. AHFC argues that evidence presented at trial allowed a reasonable jury to conclude either that the Internal Auditor position was never removed from the Executive Service or that the Internal Auditor position enjoyed a unique classification falling outside either the Regular or Executive Service. AHFC argues that the Internal Auditor was a "corporation director" within the meaning of amended Rule 2, Section 2.03.03. It argues in the alternative that, by requiring the Audit Committee to concur in the removal of the Internal Auditor, the Audit Charter created a unique category of employment for the Internal Auditor; it was neither Executive Service (permitting removal by the Executive Director at will) nor Regular Service (permitting removal only for cause and after a series of contractual protections for the employee is implemented).

---

**5.** Salvucci moved for summary judgment on the breach of contract claim. The superior court denied the motion, stating that an issue of fact existed regarding whether the Audit Charter placed Salvucci in a special classification. After evidence was presented at trial, the court granted a directed verdict for Salvucci, finding that "the evidence is just indisputably clear that the internal auditor here, the plaintiff's position, was taken out of the executive service."

At the time the Audit Charter was passed, the Internal Auditor was an Executive Service position. The Charter did not refer to or alter the Service categorization of the Internal Auditor; rather it created a distinct process of reporting and removal for the Internal Auditor. Pursuant to the Charter, the Executive Director did not have sole discretion to appoint or remove the auditor; any such action required the concurrence of the Board of Director's Audit Committee.

In 1991 Barry Hulin, then Executive Director, proposed amending the Personnel Rules to narrow the categories of positions in the Executive Service. The proposal removed the Internal Auditor from the Executive Service. In presenting the proposal to the Board of Directors, Hulin specifically stated that the amendment took the Internal Auditor out of the Executive Service. Hulin also specifically informed the Board that those persons not in the Executive Service are subject to termination only for a "performance-related cause" and cannot be terminated before receiving "progressive discipline" in accordance with contractual employment protections. In 1992 the amendment was adopted.

All parties agree that the terms of Salvucci's employment contract are governed by his employment letter, the Audit Charter and the Personnel Rules. The text of Section 2.03.03 before and after the amendment makes evident that the Internal Auditor position was included in the Executive Service before the amendment and excluded once the section was amended. Hulin's testimony confirms that one intention of the amendment was to remove the Internal Auditor from the Executive Service, and further confirms that the Board was informed of this intent before it approved the amendment. The record shows that AHFC's Deputy Executive Director and AHFC's Personnel Director were also aware that one purpose of the amendment was to remove the Internal Auditor from the Executive Service.

We have held that when the provisions of a personnel manual create reasonable expectations that employees have been granted certain rights, the employer is bound by the representations contained in those provisions.

*Parker v. Mat–Su Council on Prevention of Alcoholism and Drug Abuse,* 813 P.2d 665, 666 (Alaska 1991). Similar reasoning applies in this case. AHFC created a reasonable expectation that Salvucci was granted the rights of Regular Service employees after the 1992 amendment.

The employment letter required Salvucci to sign a statement that the Personnel Rules and any subsequent amendments to those rules governed the terms and conditions of his employment. When the Personnel Rules were amended in 1992 to delete the Internal Auditor from the list of Executive Service, Salvucci was bound to accept the amendment and the accompanying obligations or rights imposed by the Personnel Rules. Hulin informed Salvucci that the rules had been changed to remove him from the Executive Service. Salvucci read the transcript of the Board meeting at which the Board was told it was being asked to remove the Internal Auditor from the Executive Service.

As Salvucci reasonably believed that he was a Regular Service employee after the amendment, and as the superior court's analysis of the contract turns largely on his reasonable expectation, testimony at trial by Gay and DeSpain that they believed that Salvucci did not have the protections of a Regular Service employee is immaterial.

Based on the binding nature of the employment letter, the clear text of Section 2.03.03 before and after amendment, the absence of any language in the Audit Charter creating a category other than Executive or Regular Service for the Internal Auditor, Hulin's statements of intent to remove the Internal Auditor from the Executive Service to the Board before its passage of the amendment, and Salvucci's reasonable expectations, we hold that in 1993, at the time Salvucci was terminated, the Internal Auditor position was in the Regular Service.

It is undisputed that in November 1993 Gay informed Salvucci that Salvucci would be placed on administrative leave and, subject to approval by the Audit Committee, would be terminated. It is further undisputed that Salvucci was not given any reason by Gay or the Audit Committee for his termination, and

that he was not afforded the protection of progressive disciplinary procedures. Given AHFC's failure to afford Salvucci the contractual protections due Regular Service employees, we hold that the superior court correctly directed a verdict in favor of Salvucci on his breach of contract claim.

## B. *The Whistleblower Act*

The Alaska Whistleblower Act (the Act), AS 39.90.100–.150, protects public employees who report to public bodies on matters of public concern from retaliation by their employers. AHFC contends that the superior court improperly denied AHFC's summary judgment motion seeking dismissal of the Whistleblower claim because AHFC is not a "public body" within the meaning of the Act. AHFC also argues that the superior court improperly denied AHFC's summary judgment motion on punitive damages. AHFC argues that the Alaska Whistleblower Act does not provide statutory authority for punitive damages against the State.[6]

 In interpreting any statute, "our primary guide is the language used, construed in light of the purpose of the enactment." *Commercial Fisheries Entry Comm'n v. Apokedak,* 680 P.2d 486, 489–90 (Alaska 1984). "[U]nless words have acquired a peculiar meaning, by virtue of statutory definition or judicial construction, they are to be construed in accordance with their common usage." *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.,* 746 P.2d 896, 905 (Alaska 1987).

 This court applies a "sliding scale approach" toward statutory interpretation. *Peninsula Marketing Ass'n v. State,* 817 P.2d 917, 922 (Alaska 1991). "Under the sliding scale approach, the plainer the language of the statute, the more convincing contrary legislative history must be." *Mar-*

low v. Municipality of Anchorage, 889 P.2d 599, 602 (Alaska 1995).

### 1. *The protection of internal memoranda*

The Alaska Whistleblower Act provides in part:

(a) A public employer may not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because

(1) the employee, or a person acting on behalf of the employee, reports to a public body or is about to report to a public body a matter of public concern.

AS 39.90.100.

 AHFC concedes for the purposes of this appeal that Salvucci meets all elements required to bring a claim under the Alaska Whistleblower Act except the requirement to report to a "public body."[7] Although AHFC states that "[o]n its face, the statutory definition of 'public body' includes AHFC," AHFC argues that the Alaska Legislature, in passing the Alaska Whistleblower Act, did not intend for the reporting of a matter of public concern to one's own employer to give rise to protection under the Act.

We agree that, on its face, the statutory definition of "public body" includes AHFC. We now turn to AHFC's arguments that the legislative history and a coexisting statute, AS 39.90.110(c), show that the Legislature did not intend for "public body" to include the reporting person's employer. Alaska Statute 39.90.110(c) provides:

As part of its written personnel policy, a public employer may require that, before an employee initiates a report on a matter of public concern under AS 39.90.100, the employee shall submit a written report concerning the matter to the employer.

---

6. AHFC alternatively argues that Salvucci may not recover punitive damages under the Act because the jury failed to find the prerequisite compensatory damages under the Act. Our review of AHFC's first two contentions is dispositive and we need not address this issue.

7. A public employee is defined as a person who performs a service for wages for a public employer. AS 39.90.140(1). A public employer is

defined to include "a public or quasi-public corporation or authority established by state law." AS 39.90.140(2). "Matters of public concern" include "a violation of a state, federal, or municipal law, regulation or ordinance [and] ... a clear abuse of authority." AS 39.90.140(3)(A) & (C). A "public body" is defined as including an officer or agency of the state or a political subdivision of the state. AS 39.90.140(4)(B) & (C).

AHFC maintains that this statute establishes that a written report to an employer and a report protected under the Alaska Whistleblower Act are two distinct reports, with distinct legal consequences.

In support of its position, AHFC cites testimony from David Otto, Director of the State Division of Personnel, before the House State Affairs Committee regarding House Bill 91, the legislation that became the Alaska Whistleblower Act. Specifically, Otto noted that the department's primary concern was the lack of equal rights for employers in HB 91, including his belief that management would want a chance to correct any adverse situation noted by an employee before the situation was brought to the public's attention. In response to this concern, the Legislature amended HB 91 to include language that was the precursor to AS 39.90.110(c).

Nothing in AS 39.90.110(c) or its legislative history indicates that a written report to a State employer is not a report to a public body within the meaning of the Act. AHFC presented no evidence that the Legislature intended a report under AS 39.90.110(c) to go unprotected. The legislative history indicates only that the purpose of AS 39.90.110(c) was to give the employer an opportunity to correct any problems identified by the employee. It serves the public interest to allow the employer a first opportunity to take remedial action because the employer is the body most likely to be in a position to address or cure impermissible conduct.

AHFC's view would leave any State employee reporting impermissible conduct to the State (such as the Attorney General's Office, the Legislature or the Human Rights Commission) without protection from retaliation. A failure to protect such reporting is likely to result in fewer complaints regarding impermissible activity by the State. This result could pose a distinct threat to the public good.

In *Appeal of Bio Energy Corporation*, 135 N.H. 517, 607 A.2d 606 (1992), the New Hampshire Supreme Court found, after employer Bio Energy presented an argument similar to that argued by AHFC, that the New Hampshire Whistleblower Act covered internal reports by State employees to their employer. New Hampshire's Whistleblower Act is comparable to Alaska's Whistleblower Act in substance; it protects employees who report violations of the law and includes a provision, Paragraph II of RSA 275–E:2, requiring that the employee make an internal report of the alleged violation. *Id.*, 607 A.2d at 608. The *Bio Energy* court stated:

> We cannot accept Bio Energy's argument that the legislature intended that paragraph II of the Act [comparable to AS 39.90.110(c)] require a further report to a third party. Under Bio Energy's interpretation of the Act, employers would be able to retain the benefit of notification, while avoiding the burdens imposed if the employee were discharged because of his or her notification to the employer. Such an interpretation would thwart the Act's primary purpose of encouraging employees to report their employers' violations of law.
>
> . . . .
>
> . . . The interpretation argued by Bio Energy undermines the deterrent effect of the Act; a reading of the statute that required a second report would leave employees . . . unprotected, despite the statute's clear intent to protect such employees from wrongful discharge.

*Id.* at 608–09.

We agree with the *Bio Energy* court's reasoning. Alaska's Whistleblower Act protects reports made to State employers. *See Pogue v. United States Dep't of Labor*, 940 F.2d 1287, 1290 n. 2 (9th Cir.1991) (finding that an internal complaint constitutes whistleblowing under federal anti-retaliation law). The purpose of the Act is undermined by an interpretation that allows an employer to mandate that an employee report first to the employer, but provides the employee no protection for such reporting. We therefore hold that the superior court properly denied AHFC's summary judgment as to Salvucci's claim under the Whistleblower Act.

### 2. *Punitive damages against the State*

██ AHFC argues that the Whistleblower Act does not authorize an award of punitive damages against the State or its instrumentalities. AHFC claims that the language

in AS 39.90.120(a), "including punitive damages," does not create a statutory exception to the State's immunity from punitive damage awards. We agree.

 We reach our conclusion on the basis of two reasons. First, a presumption exists based on sound public policy which disfavors punitive damage awards against the State. Under the presumption, punitive damages against the State may not be awarded unless there is express and specific statutory authorization. The Whistleblower Act does not expressly and specifically authorize a punitive damage award against the State and therefore punitive damages may not be awarded. Second, the legislative history of the Whistleblower Act clearly shows that punitive damages were written into the Act to ensure that punitive damage awards would be available against individual, not governmental, defendants.

a. *The presumption disfavoring punitive damages governs this case.*

Alaska is among the "overwhelming majority of jurisdictions" which endorses the rule that punitive damages may not be awarded against governmental entities in the absence of explicit statutory authorization. *See* Benjamin W. Baldwin, *Jackson v. Housing Authority: The Availability of Punitive Damages in Wrongful Death Actions Against Municipal Corporations,* 65 N.C. L.Rev. 1441, 1447 n. 55 (1987). No decision of this court has ever authorized an award of punitive damages against a public entity.[8] Alaska's general tort claims act specifically excludes awards of punitive damages against the State. AS 09.50.280. Further, Salvucci acknowledges that except for the Whistleblower Act, "public entities [are] not liable for punitive damages in any type of lawsuit" in the state of Alaska.

The policy reasons underlying the presumption disfavoring punitive awards against

public entities, and the fact that such awards have not been permitted, are clear. We referred to these reasons in *Hazen v. Municipality of Anchorage,* 718 P.2d 456, 465–66 (Alaska 1986), and they were explained in greater detail by the United States Supreme Court in *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). We summarize them here.

 First, punitive damages are not intended to compensate the victim of a wrongful act. They are over and above full compensation and thus are, from the plaintiff's standpoint, a windfall. *Lundquist v. Lundquist,* 923 P.2d 42, 50 (Alaska 1996). Punitive damages are therefore not awarded because of the wronged victim's needs. Instead, punitive damages are imposed to punish malicious wrongdoers and to deter future malicious wrongs. *Hazen,* 718 P.2d at 465–66; *Fact Concerts,* 453 U.S. at 266–67, 101 S.Ct. at 2759–60.

As we observed in *Hazen,* punishing government punishes the governed, not the malicious official:

> An award of punitive damages against a [government entity] will only "punish" the innocent taxpayers, the group which is supposed to benefit from the public example set by a punitive damages award. Further, since a [government entity] can have no malice independent of the malice of its officials, damages awarded in order to punish are not sensibly assessed against the [government entity] itself.

*Id.* at 465 (citations omitted). Likewise, the deterrence rationale is not well served by an award of punitive damages against a government entity. If a government official who has acted maliciously is to be deterred by a punitive damage award, an award against the official, rather than against the government, will better serve that end. As the court observed in *Fact Concerts:*

---

**8.** *See, e.g., Johnson v. Alaska State Dep't of Fish & Game,* 836 P.2d 896, 906 (Alaska 1991) (punitive damages not available against State for violation of Alaska Human Rights Act); *Hazen v. Municipality of Anchorage,* 718 P.2d 456, 465–66 (Alaska 1986) (policy reasons disfavoring punitive damages apply even in cases of gross or intentional misconduct); *Richardson v. Fairbanks*

*North Star Borough,* 705 P.2d 454, 456 n. 1 (Alaska 1985) ("We agree with the majority of jurisdictions that hold that punitive damages cannot be awarded against a municipality without statutory authorization."); *University of Alaska v. Hendrickson,* 552 P.2d 148, 149 (Alaska 1976) (punitive damages cannot be awarded against University of Alaska).

[T]here is available a more effective means of deterrence. By allowing juries and courts to assess punitive damages in appropriate circumstances against the offending official, based on his personal financial resources, the statute directly advances the public's interest in preventing repeated constitutional deprivations. In our view, this provides sufficient protection against the prospect that a public official may commit recurrent constitutional violations by reason of his office. The Court previously has found, with respect to such violations, that a damage remedy recoverable against individuals is more effective as a deterrent than the threat of damages against a government employer.

*Id.* at 269–70, 101 S.Ct. at 2761 (footnote omitted). Finally, as we observed in *Hazen,* the responsiveness of our democratic institutions makes punitive damage awards against governments unnecessary:

[P]rotection against future misconduct [on the part of a governmental official] can be obtained without resorting to punitive damage awards which the public will have to foot:

It is assumed that public officials will do their duty, and if discipline of a wrongdoing municipal employee is indicated, appropriate measures are available through the electorate, or by superior officials responsible to the electorate.

*Id.* at 465–66 (quoting *Ranells v. City of Cleveland,* 41 Ohio St.2d 1, 321 N.E.2d 885, 888 (1975)).

In short, there are a combination of reasons why punitive damage awards against governments are disfavored: punitive damages are not needed to compensate victims; the punishment rationale does not make sense when applied to government; and deterrence of future misconduct is better accomplished by other means, including personal awards of punitive damages against individual wrongdoers.

Still, the presumption disfavoring awards of punitive damages against governmental entities can be overridden by "express and

specific statutory authority." *Johnson v. Alaska State Dep't of Fish & Game,* 836 P.2d 896, 906 (Alaska 1991). Thus, the question here is whether the Whistleblower Act expressly and specifically authorizes an award of punitive damages against a public employer.

The structure of the Whistleblower Act is as follows. Alaska Statute 39.90.100(a) expresses the substantive command:

A public employer may not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because ... [e.g., the employee has disclosed matters of public concern].

Alaska Statute 39.90.120 sets out the remedies for violations. It provides:

(a) A person who alleges a violation of AS 39.90.100 may bring a civil action and the court may grant appropriate relief, including punitive damages.

(b) A person who violates or attempts to violate AS 39.90.100 is also liable for a civil fine of not more than $10,000. The attorney general may enforce this subsection.

(c) A person who attempts to prevent another person from making a report or participating in a matter under AS 39.90.100(a) with intent to impede or prevent a public inquiry on the matter is liable for a civil fine of not more than $10,000.

Subsection .120(a) authorizes a person who alleges a violation of section .100 to bring a civil action, and it authorizes the court in which the action is brought to "grant appropriate relief, including punitive damages." Subsection (a) does not, however, specify the defendants against whom the civil action may be brought. It is logical to suppose that any person or entity which is capable of violating or attempting to violate section .100 may be a defendant under subsection (a) of section .120. Subsection .120(b) recognizes that individuals—that is, individual government employees—are capable of violating or attempting to violate section .100.[9] It follows that the defendants who may be sued under sub-

---

9. To conclude otherwise, one would have to read subsection (b) as authorizing the attorney general

of the state to sue the state for a civil fine which

section .120(a) include individuals as well as public employers. Further, this conclusion is implied by the text of subsection .120(b), which states that "a person who violates ... [section .100] is *also* liable for a civil fine...." The word "also" implies that the person described is also liable under subsection .120(a).

With this in mind the question whether the statute expressly and specifically authorizes punitive damage awards against public employers comes into perspective. The statute authorizes actions against public employers and individuals. It says that appropriate relief may be granted, including punitive damages. It does not say that punitive damages are "appropriate" in actions against public employers. Does it then expressly and specifically authorize punitive damage awards against public employers?

The answer is "no." Instead of being express and specific as to whether punitive damages can be awarded against public employers, the statute is noncommittal and ambiguous on this point. Given that the statute is neither express nor specific, the inquiry can end. The presumption disfavoring punitive damage awards against public entities governs, dictating the conclusion that no award of punitive damages is available against public entities under the Act.

b. *Legislative history shows that reference to punitive damages was added to the Act because of concern that such damages would not be available in actions against private individuals.*

AHFC also relies on legislative history to support its argument that the punitive dam-

age language was added only to guarantee that private individuals could be liable for punitive damages under the Act. As initially drafted, the bill which became the Whistleblower Act contained no mention of punitive damages. There was a period after the phrase "may grant appropriate relief" in AS 39.90.120(a). *See* Committee Substitute for House Bill (C.S.H.B.) 91, 16th Leg., 1st Sess. (1989); House Bill (H.B.) 91, 16 Leg., 1st Sess. (1989). If the Act had been enacted in that form, it would have been clear that punitive damage awards against public employers would not be available. The bill was amended and authority to award punitive damages was added. However, the legislative history shows that this amendment was made not to authorize punitive damage awards against public employers, but to ensure that individual defendants would not be immune from punitive damages because of the civil fine provisions of subsections (b) and (c).

██ The deliberations of the legislative committee which considered the bill are tape recorded. The tapes of the deliberations make clear the intent of the sponsor of the amendment which added the reference to punitive damages.[10] The concern of the sponsor was that the provision for civil fines against individual defendants in subsections .120(b) and (c) might be construed to exclude awards of punitive damages. In order to foreclose such an argument, the phrase "including punitive damages" was added to subsection .120(a).[11] Since civil fines are only

---

would be paid by the state to the state. Such a reading would be an absurdity.

10. "[I]t is the sponsors that we look to when the meaning of statutory words is in doubt." *Alaska Pub. Employees Ass'n v. State,* 525 P.2d 12, 16 (Alaska 1974) (quoting *Schwegmann Bros. v. Calvert Distillers Corp.,* 341 U.S. 384, 394–95, 71 S.Ct. 745, 750–51, 95 L.Ed. 1035 (1951)).

11. The sponsor of the amendment adding the reference to punitive damages was Representative Gruenberg. At the meeting of the House Judiciary Committee of March 7, 1989, Representative Gruenberg spoke in favor of the amendment as follows:

I'm going to talk about this generally and offer a motion on the amendment. Generally it

clears up an ambiguity in making it very specific that you can obtain punitive damages under the Act. The reason we made th—this amendment would be helpful is because lawyers in the A.G.'s office have informed Mark Handley that there is a possible interpretation that punitive damages in a private lawsuit would not be awardable because we have subsection (b) and (c) on line 26 of page 2 and line 29 of page 2 and a judge might say that if you have a punitive situation, you can't get personal punitive damages, all you can get is a civil fine which inures to the state and only the A.G. can enforce that. The problem is that the A.G. may never enforce subsection (b) because he'd be enforcing it—he or she would be enforcing it against the administration and there'd be a

available against individual defendants, reference to punitive damages was added to subsection (a) for a reason unique to actions against individual defendants. The legislative history on the amendment is comprehensive and shows no other purpose for the amendment.[12] It therefore seems incontestable that the amendment was not added to authorize punitive damage awards against public employers.

In conclusion, AS 39.90.120(a) does not expressly and specifically authorize awards of punitive damages against government entities. The text of the statute is ambiguous as to whether such damages were meant to be authorized against such defendants. The presumption disfavoring punitive damage awards against government entities therefore applies and the statute will not be construed as authorizing such awards. Moreover, the legislative history of the amendment which added reference to punitive damages to the statute shows that the amendment was added not to make government entities liable for punitive damages, but to ensure that individual defendants would not be immunized from punitive damages. That purpose is consistent with the reasons underlying the pre-

sumption disfavoring punitive damage awards against government entities.

For these reasons we hold that AHFC may not be held liable for punitive damages under the Whistleblower Act.

### C. Prejudgment Interest

The superior court awarded Salvucci prejudgment interest in the amount of $62,-493.30. It is unclear precisely how much prejudgment interest it based on the award for lost past and future wages as well as benefits, and how much it based on the award for punitive damages. AHFC argues that the jury was improperly instructed as to the appropriate date to begin calculation of the damage award to its present value.

Alaska law presumes that prejudgment interest will be awarded on verdicts for damages. AS 09.30.070(b).[13] The rate is set at 10.5 percent interest. AS 09.30.070(a). The 10.5 percent interest rate on judgments is increased by five percent per year if final judgment is entered for an amount greater than a valid offer of judgment made by the plaintiff at least ten days prior to trial. AS 09.30.065.[14]

---

conflict of interest and there's no funding for this. So as a practical matter, subsection (b) may not be very helpful. Same with subsection (c), and having punitive damages may be the only effective form of relief you have.
House Judiciary Committee Standing Committee, Mar. 7, 1989. Thus Representative Gruenberg offered the amendment adding punitive damages to the Act out of concern "that punitive damages in a private lawsuit would not be awardable" because of the civil fine remedies in subsection (b) and (c) of section .120.

12. The remarks of counsel Mark Handley express the same purpose:

[T]he reason I am recommending the amendment is ... talking to Jan Strandberg in the court system who had apparently, who has been representing the plaintiff in some wrongful termination suits against the state and various municipal bodies and after talking to the Attorney General's office, I thought it might be a good idea, there seems to be an issue as to whether, under section (b) when we are proposing that there is a civil fine of not more than $10,000, we might be opening this law up to the interpretation that we're foreclosing the possibility of punitive damages in this case, that that is sort of a substitute liquidated punitive section, and *we just want to make it clear*

*with this language that the plaintiff in this action is still able to get any punitive damage that they would be able to get under existing law.*
House Judiciary Committee Standing Committee, Feb. 23, 1989 (emphasis added). The emphasized language suggests no intention to allow punitive damage awards not previously authorized. Since no punitive damages could be awarded against the State previously, Handley's desire to preserve what already existed cannot be read to expand available remedies.

13. AS 09.30.070(b) provides in part:

Except when the court finds that the parties have agreed otherwise, prejudgment interest accrues from the day process is served on the defendant or the day the defendant received written notification that an injury has occurred and that a claim may be brought against the defendant for that injury, whichever is earlier.

14. In this case, the final judgment entered against AHFC on Salvucci's claim exceeded his $400,000 offer of judgment that was made pursuant to AS 09.30.065. Salvucci was awarded $187,434 in lost past and future wages and benefits, $500,000 in punitive damages, and $62,-493.30 in prejudgment interest. The trial court applied a 15.5 percent prejudgment interest rate.

■ Prejudgment interest, for the time between when a complaint is served and judgment rendered, is awarded on damages for lost future earnings if the future loss is reduced to present value as of the date the complaint was served. *Navistar Int'l Transp. Corp. v. Pleasant*, 887 P.2d 951, 959–60 (Alaska 1994). If future damages are reduced to present value as of the date of trial, no prejudgment interest should be awarded because the award encompasses the period prior to trial. *Id.*

■ At trial Salvucci's economist presented damage calculations that reduced the future loss to its present value as of the date of the service of the complaint. AHFC's economist presented calculations reducing the same damages to present value as of the date of the first day of trial. The jury did not specify which calculation it used in reaching its damage award for lost past and future wages and benefits.

■ AHFC did not object at trial to the instructions given for calculating the lost future wage and benefit award, nor did it request its own instructions. Failure to object to the instructions at that time waived its right to raise the issue on appeal. Alaska R. Civ. P. 51(a). "[G]enerally, in the absence of a proper objection, we will not review a jury instruction unless the giving of the challenged instructions was plain error. Plain error will only be found when an obvious mistake exists such that the jury will follow an erroneous theory resulting in a miscarriage of justice." *Landers v. Municipality of Anchorage*, 915 P.2d 614, 617 (Alaska 1996) (citation omitted).

The jury was presented evidence from both economists. The jury is not required to compute damages with mathematical precision; the jury simply needs a reasonable

basis on which to base their calculations. *City of Whittier v. Whittier Fuel & Marine Corp.*, 577 P.2d 216, 224 (Alaska 1978). AHFC concedes that, under *Navistar*, Salvucci is entitled to prejudgment interest on the $144,234 if the calculations of Salvucci's economist are used. As the figures awarded by the jury reasonably appear to be based on those presented by Salvucci's economist, we hold that the superior court's instructions regarding reduction of the damage award to its present value did not constitute plain error.

■ The superior court did not segregate the amount of prejudgment interest awarded on lost past and future wages as well as benefits and the amount awarded on punitive damages.[15] Since we hold today that the award of punitive damages was improper, prejudgment interest cannot be awarded on this basis.[16] For this reason, we remand to the superior court to determine, consistent with this opinion, the precise amount of prejudgment interest due Salvucci on his lost past and future wage and benefit award.

## V. CONCLUSION

The superior court properly granted Salvucci's directed verdict on his breach of contract claim, and properly allowed Salvucci's Whistleblower claim to be submitted to the jury. We AFFIRM the superior court on these issues. The superior court erred by holding that AHFC was not immune from punitive damages. Thus, we REVERSE the award of punitive damages against AHFC. We REMAND the prejudgment interest award on lost past and future wages and benefits to the superior court for determination of the proper amount to be awarded.

COMPTON, Chief Justice, with whom RABINOWITZ, Justice, joins, concurring.

---

However, since we hold today that it was error to award punitive damages, Salvucci's final judgment no longer exceeds his offer of judgment, and increased interest is no longer appropriate.

**15.** AHFC calculates that the amount of prejudgment interest on lost future wages and benefits awarded by the superior court is $25,847.52, but does not set forth how it reached this amount. Salvucci does not address the amount of prejudgment interest that he believes should be appro-

priately awarded on the lost future wages and benefits. We have no record of the superior court's calculation on this award. Moreover, as noted earlier, the superior court should now apply a 10.5 percent interest rate to the wage and benefit award.

**16.** Since we hold it was error to award punitive damages, we express no opinion regarding the propriety of awarding prejudgment interest on punitive damages under AS 09.30.065.

In my view, the court's analysis of whether punitive damages are recoverable under the Whistleblower Act, Op. at section IV.B.2.a., reaches the correct result: the express language of AS 39.90.120(a) does not overcome the presumption against awarding punitive damages against the government. While the legislative history of AS 39.90.120(a), Op. at section IV.B.2.b., is interesting, it is ambiguous and, in any event, unnecessary to resolve the issue. I do not concur in section IV. B.2.b.'s conclusion that the legislative history of the amendment in question shows that "the amendment was added not to make government entities liable for punitive damages, but to ensure that individual defendants would not be immunized from punitive damages." Op. at 1126. In all other respects, I agree with the opinion of the court.